KENNUNGUNDA P. ARENDS, Appellee, v. JOHN FRERICHS et al., Appellants.

**TRUSTS: Fiduciary Relations—Parent and Child.** A parent who, in good faith and for adequate consideration, purchases property in which his minor child, as an heir, has an interest which is negligible, owing to the incumbered condition of the property and its liability for other debts, does not, because of the existing fiduciary relation, become a trustee of the property for the benefit of the child.

**TENANCY IN COMMON: Acquisition of Outstanding Title by Co-tenant.** A mother who purchases an outstanding title to property which is held by her *in common* with her minor child, and at all times thereafter, with knowledge of the child, takes possession, and claims and exercises absolute ownership over the property for more than ten years after the child attains its majority, acquires full title by adverse possession, even though it be conceded, *arguendo,* that the *original* acquisition of the outstanding title by the mother amounted to nothing more than an equitable redemption of the property for the common benefit of herself and child.

*Appeal from Grundy District Court.*—THOMAS J. GUTHRIE, Judge.

OCTOBER 18, 1921.

ACTION in equity, to recover an interest in real estate. A decree was entered for plaintiff, and the defendants appeal. The facts appear in the opinion.—*Reversed.*

*Edwards, Longley, Ransier & Harris* and *F. A. Ontjes,* for appellants.

*Deacon, Good, Sargent & Spangler,* for appellee.

FAVILLE, J.—I.  Conrad Pickleman was a farmer, residing in Grundy County, Iowa.  He owned 280 acres of land, and had some personal property and an equitable interest in other real estate.  Pickleman died in 1878, leaving surviving him a daughter, at that time about two years of age, and his widow, Folka Pickleman, about 20 years of age.  The child grew to womanhood and married.  The widow married a man by the name of John Frerichs.  This action was originally brought by the daughter against her mother, to recover an interest in the remaining portion of the said 280 acres of which Conrad Pickleman died seized.  During the pendency of the litigation, the mother died, and the appellants herein are her surviving husband and children, and the executor of her will, who were substituted as defendants.

Pickleman was heavily indebted at the time of his death. He left no will, and his father-in-law was appointed administrator of the estate.  In due time, the estate was closed, and the general creditors of Pickleman received less than 40 cents on the dollar on their various claims.  At the time of Pickleman's death, the real estate in controversy was incumbered by a mortgage of $2,600 and interest, and there was also outstanding thereon a mechanics' lien for about $400, which was held by one Turner.  In May, 1878, action was commenced by Turner to foreclose his mechanics' lien.  The foreclosure proceedings went to decree, and execution was issued, and the land was sold, to

satisfy said decree. The sheriff's certificate of sale was issued to Turner, the plaintiff in said action, who subsequently assigned the same to one Aikin. Shortly before the period of redemption expired, Aikin assigned the certificate of sale to Hinderk Frerichs, uncle of the widow, Folka Pickleman, for a consideration of $400, and on September 1, 1880, Hinderk obtained and recorded a sheriff's deed to said land. On the same day, he executed a special warranty deed to the widow, Folka, which deed he retained as security for the purchase price to be paid by her. About two years thereafter, said deed was delivered to the said Folka, and was placed on record March 1, 1883. On December 8, 1880, the district court of Grundy County set off to the said widow, Folka, 65 acres out of said farm as her distributive share.

Immediately following the death of Conrad Pickleman, the widow and her daughter made their home with the widow's father, one Harm Kramer. In the spring of 1883, the widow married John Frerichs, son of said Hinderk Frerichs, and shortly after their marriage, these parties moved upon the farm in question, and continued to live there for several years. Buildings, fences, and tiling were placed upon the farm, and it was mortgaged, and one 40 was sold.

Some 30 years before this case was tried, Folka rented the farm to one Myer, who occupied it as tenant thereafter, and until after this suit was commenced. The daughter lived on the farm with her mother and stepfather for several years. She was married in 1896, and thereafter lived in the village of Holland, about three miles distant from the farm, where her husband was engaged in business as a general merchant. After the mother rented the farm to Myer, she also lived in the village of Holland, and continued to reside there until her death. The mother collected all the rents and paid the taxes, and exercised full ownership of the farm.

This action was begun in 1914, and by it the appellee seeks to establish an interest in the said land as heir of her deceased father, Conrad Pickleman, and she also seeks an accounting for the rents derived from the land by the mother since the father's death.

It is the contention of the appellants that the mother, Folka,

obtained the full legal title to the premises by deed from Hinderk Frerichs to her, and that, in any event, her title has ripened by adverse possession, and that the appellee is now estopped from asserting any interest in said premises. The statute of limitations is also relied upon as a defense.

The testimony in the case is exceedingly voluminous. It is impossible for us to set it out in detail. The administration of the estate of Conrad Pickleman involved many transactions. There were numerous contests between his creditors and the administrator of his estate. Many hearings were had before a referee. Objections were filed to the reports of the administrator, and hearings were had thereon. The record of these somewhat complicated and voluminous proceedings in the administration of the estate of Conrad Pickleman has been transported *en masse* into the record in this case, including depositions and the transcripts of testimony taken during the various stages of the administration of the estate of said decedent. A considerable amount of this evidence is incompetent, and cannot be considered in determining the issues in this case.

The storm center of this controversy is in regard to the deed which Folka obtained from Hinderk to the land in controversy.

II. It is contended by appellee that the whole proceedings which resulted in the execution and delivery of the deed to the premises from Hinderk Frerichs to Folka were in fulfillment of a scheme on the part of Folka to cheat and defraud her daughter, the appellee, of her interest in this land. Practically every incident and circumstance connected with this transaction, from the filing of the mechanics' lien by Turner until the delivery of the deed from Hinderk Frerichs to the widow, is exhibited as evidential of a fraudulent scheme. It is contended that this woman, left a widow at about 20 years of age, and beset by the numerous creditors of her husband, started out to deliberately plan to cheat and defraud her child, then about two years of age, out of her interest in her father's estate. It is suggested that she conspired with the party who held the mechanics' lien to have the same foreclosed, and that she fraudulently failed to interpose a defense in said action. The fact that one of her attorneys was appointed guardian *ad litem* for the minor child in certain proceedings is noted as a suspicious

circumstance. The fact that she testified as a witness upon the trial of the mechanics' lien case, and that by her it was established that the material furnished her husband went upon the premises in controversy, is also claimed to be a badge of fraud. It is likewise urged that the action to foreclose the mechanics' lien was barred by the statute of limitations, and that the widow did not interpose such defense, and that this is evidence of a fraudulent purpose on her part. The fact that she married the son of Hinderk Frerichs, who acquired the title and conveyed the same to her, is also claimed to be indicative of the fraudulent character of the transaction.

We have not attempted to review all the evidence on this question, but merely to outline some of its general characteristics. We have examined the record with care, and find that the appellee has failed to establish her claim of actual fraud on the part of the widow in regard to the foreclosure proceedings in the mechanics' lien case. We are satisfied from the record that the lien holder, one Turner, brought the foreclosure action in good faith, without any collusion or conspiracy with the widow, Folka; that the decree of the court was obtained without fraud; and that the proceedings which culminated in the issuance of the sheriff's certificate of sale to the lien holder, Turner, and his assignment thereof to Aikin, were all done in good faith.

It is contended that, after the sale of the premises under the foreclosure proceedings, the widow, Folka, arranged for the procurement of the sheriff's deed and a subsequent conveyance of the title to her, in pursuance of a fraudulent scheme on her part to cheat appellee. As to this feature of the transaction, which we shall discuss somewhat later, we also fail to find from the evidence that the widow was guilty of fraud. Our conclusion is that the contention of the appellee, that in these various transactions the mother was actuated by a purpose to cheat and defraud the appellee, and did so cheat and defraud her, is not sustained by the proof. A further recital of the evidence upon which we base this conclusion would serve no useful purpose, but none of it has been overlooked.

III. It is one of the contentions of the appellee that, by virtue of the fiduciary relation existing between the mother and her minor daughter, the procurement of the title to the land

1. TRUSTS: fiduciary relations: parent and child.

by the mother was a fraud upon appellee, and that, in any event, the mother held the premises in trust for the appellee, as heir of her deceased father.

As before stated, we fail to find evidence of any intent on the part of the mother to cheat and defraud the appellee. Is she chargeable as a trustee? The mother, as natural guardian of her child, was undoubtedly required, both by good morals and by law, to exercise the utmost good faith in dealing with the property rights of her infant child. But a parent is not *ipso facto* a "trustee" of the property of a child, nor is a parent absolutely prevented from acquiring an interest in property belonging to a child. The relationship does not, in and of itself, create a trusteeship. The relation between the parties is fiduciary and confidential. Scrupulous good faith is required at all times, but a parent is not prevented from purchasing in good faith, and for a valuable and adequate consideration, property in which a minor child may have an interest. By such a purchase, if fairly and honestly made, in good faith and for a valuable and adequate consideration, the parent does not become a trustee of the property so purchased, from the fact of the relationship between the parties alone.

As before stated, the land involved herein consisted of a tract of 280 acres. There was an outstanding mortgage of approximately $2,600 against it. The mechanics' lien had been foreclosed and the entire premises sold thereunder for $400 on August 30, 1879. Numerous creditors had filed their claims against the estate of the decedent. During the year of redemption from the mechanics' lien foreclosure, the administrator of the estate had made application to the court for an order to sell the real estate of the decedent, to pay debts of the estate. A referee appointed by the court to consider this matter reported to the court that the premises were incumbered to the full amount of their value. This report was approved by the court, and an order for a sale of the premises was refused by the court. The creditors of the estate received less than 40·cents on the dollar of their claims on final settlement. The widow was entitled to her share in the premises, under the statute, free from debts.

Various witnesses testified that, in their opinion, the land

was worth from $25 to $30 an acre in 1880. The record of sales of land in that locality during that year (1880) indicated that the recited consideration in transfers was, on an average, considerably less than $20 an acre. It is obvious that testimony of this character, respecting a particular tract of land at a remote time, with the fluctuation in values from year to year, must, of necessity, be somewhat uncertain. While the dower interest of the widow had not been formally set off to her by order of court at this time, she was entitled, as a matter of law, to the admeasurement of her dower in the land and to the setting apart to her of one third in value of the estate, free from debts; so that the value of the appellee's interest in the land of the decedent must be determined by taking into consideration the value of the dower interest of the widow in said land. The outstanding mortgage, with its accumulated interest, the amount due on the mechanics' lien, and the sum owing to general creditors approximately equaled, if it did not exceed, the estimated value of the appellee's interest in the lands of the decedent at the time. The finding of the court, upon the application of the administrator for authority to sell the land to satisfy the indebtedness, that the premises were incumbered to the full amount of their value, is of significance, and the conclusion seems to be supported by the evidence offered in this case. We are satisfied from the record that, practically speaking, there was no monetary value to appellee's interest in the land at that time. It was at least negligible. We do not find that, under the facts disclosed by the record, the widow acted in bad faith in the acquisition of the title to the land, or that, by reason of the circumstances and the relationship of the parties, she should be charged as a trustee because of the relationship of parent and child. As bearing on the question herein discussed, see *Welch v. McGrath,* 59 Iowa 519; *Otto v. Schlapkahl,* 57 Iowa 226.

IV. It is contended, however, that, by reason of the facts and circumstances disclosed in the record, the acquisition of the deed to the premises by Folka should be held, in equity, to be a redemption by her as a cotenant of property belonging to her and her daughter, as tenants in common, and that such equitable redemption inures to the benefit of the appellee, as

such cotenant. It is assumed by both parties to the case that the appellee and her mother were tenants in common of the premises, and we are not called upon to determine that question.

It will be noticed that, at the time the land was sold at the sheriff's sale under the foreclosure of the mechanics' lien, to wit, on August 30, 1879, the widow's dower had not yet been definitely set off to her by order of court. The application to admeasure her dower had, however, been filed on June 9, 1879, the day before the decree was entered in the foreclosure case. The court had recognized her right to dower in the premises, and had appointed referees to admeasure it. The report of said referees admeasuring her dower was filed on June 19, 1880. The report was not approved by the court until December 8, 1880. The widow had been made a party defendant in the foreclosure proceedings, and, so far as the record discloses, there was no reference to, or recognition of, her dower rights in the premises in the foreclosure action.

There is no doubt that she knew of the foreclosure of the mechanics' lien, and that the entire farm had been sold thereunder. It also appears from the evidence that, before the year of redemption expired, her attorneys interviewed the holder of the certificate of sale, respecting an assignment of the same; but nothing came of this, and there is no evidence to show that Hinderk Frerichs, who did procure an assignment of the certificate from Aikin, ever knew of this action on the part of the attorneys. The period of redemption from the sale under foreclosure of the mechanics' lien expired August 30, 1880. The widow, Folka, prior to the expiration of the year of redemption, interviewed her uncle, Hinderk Frerichs, in regard to the outstanding sheriff's certificate. Just exactly what was said and done between the parties and the deductions to be drawn therefrom form the subject of extensive discussion by counsel for both parties. Hinderk Frerichs was not a witness in regard to this transaction. The widow, Folka, testified in regard thereto on two different occasions, and it must be conceded that her testimony is not altogether consistent. It is evident that she was solicitous to save something, if possible, out of the wreckage of her husband's estate. It is strenuously contended by the appellee that the conduct of the widow in connection with this

matter was in pursuance of a fraudulent scheme and design on her part to secure the entire farm for herself, and to cheat and defraud the appellee of her interest therein. The widow admitted, on cross-examination, that she made "an arrangement" with Hinderk Frerichs for him to advance the money for the purpose of securing the certificate of sale, and that this "arrangement" with him was made before he took the assignment. At one time, she testified that the talk was with regard to the farm, and at another time, she testified that it was only with regard to the 65 acres. The testimony in regard to the so-called "arrangement" was to the effect that, when she interviewed her uncle in regard to the matter, he told her that he would see about it, and would talk it over with his wife. She testifies that nothing further was said between her and Hinderk in regard to the matter until Hinderk secured the sheriff's deed. After this talk with the widow, however, Hinderk approached the holder of the sheriff's certificate of sale, and on August 25, 1880, secured an assignment of the same for a consideration of $400. The widow testified that she contributed no part of this amount. The day after the period of redemption expired, Hinderk obtained a sheriff's deed to the premises. At the same time and place that he secured the sheriff's deed, Hinderk executed to the widow a special warranty deed for the premises, and orally agreed with the widow to convey the premises to her upon her payment to him of a consideration of $800, which was twice the amount that he had paid for the assignment of the sheriff's certificate. The deed recited a consideration of $3,000; but, as before stated, there was an outstanding mortgage on the farm of $2,600 and accumulated interest. The widow's testimony was to the effect that the understanding was that Hinderk was to hold the deed as security for the payment to him of $800, and that, when the same was so paid, the deed was to be delivered to her. She also testified that she was about two years in paying to Hinderk the $800, and that, when it was all paid, he delivered to her the deed, which she placed of record on March 1, 1883.

During this period of time, the widow did not have possession of the land. Thereafter, she married John Frerichs, son of Hinderk, and took actual possession of the farm and

built buildings and fences thereon, placed tiling on the same, executed mortgages thereon, sold one 40 of the tract, and continued thereafter to hold possession, either by herself or by a tenant, until this suit was commenced.

Assuming that the parties were tenants in common, we have held that one cotenant cannot acquire an outstanding title to land held by tenants in common, and thus defeat the title of the other cotenant to his undivided interest, where each owes a duty to protect the title. In *Weare v. Van Meter,* 42 Iowa 128, we said:

"A tenant in common holds a several interest in the lands, which is so far identical with his cotenants' interest that, in all matters affecting the estate, he will be regarded as acting for them, as well as for himself. He cannot, therefore, purchase an outstanding adverse title and set it up against his cotenants, if they are willing to reimburse him *pro rata* for the money by him so expended. He will be regarded as holding the title he thus acquires in trust for his cotenants, until the presumption is repelled by their refusal to contribute in payment of his outlays."

To like effect, see *Flinn v. McKinley,* 44 Iowa 68; *Fallon v. Chidester,* 46 Iowa 588; *Tice v. Derby,* 59 Iowa 312; *Sorenson v. Davis,* 83 Iowa 405; *Moy v. Moy,* 89 Iowa 511; *Patty v. Payne,* 178 Iowa 593; and *Crawford v. Meis,* 123 Iowa 610.

The reason for the rule so announced is that the duty rests upon each cotenant to protect the estate held in common, said duty being reciprocal. The protection of the title to the property so held in common by one cotenant inures to the benefit of the other cotenant, who stands ready to make good his proportionate share of the debt for which both are liable. The rule announced is sound, and we reaffirm it.

It is contended, however, that this rule does not apply in the instant case, because, it is claimed, the duty to pay off the outstanding lien was not a duty resting upon each of the cotenants, assuming them to be such. It is contended that the widow was entitled to her dower in the real estate of the decedent, free from all the debts of the intestate, and that the share of the appellee alone was liable for the payment of debts, and hence there was no reciprocal duty to protect the property and pay off the lien.

It is also contended that the appellee could not have paid off the debt and charged any portion thereof to the widow's share, as she was entitled to hold the same free from all the debts of decedent.

It is also urged as significant that the appellee's interest in the premises, in view of the indebtedness of the estate for which her share was liable, was of little value, and that appellee could lose nothing by foreclosure and sale, because she had nothing to lose.

As between the appellee and her mother, if the appellee had redeemed from the foreclosure of the mechanics' lien, she could not have enforced contribution from her mother, because the latter was entitled to her dower in the real estate free from the debts of the decedent, and the share of the appellee was alone liable for the debt.

It is strenuously insisted that the rights of both the appellee and the widow were entirely lost by the issuance of the sheriff's deed; that the fee title vested in Hinderk Frerichs; and that the acquiring of the title by the widow some two years later, upon the payment of twice the amount that Frerichs had paid to procure the assignment of the title, was not, in equity, a redemption of the premises, but was an absolute purchase of the full fee title and a vesting of the same in the widow; and that the appellee had been completely divested of any and all interest she had in said premises.

We are not agreed on the proposition as to whether or not the acquiring of the title by the widow, Folka, under the circumstances disclosed, should be held to be an equitable redemption of the premises that inured to the benefit of the appellee, as a tenant in common with the widow. Some of the members of the court are of the opinion that the transaction constituted an equitable redemption by one cotenant. Other members of the court are of the opinion that there was no equitable redemption whatever, and that the title to the premises vested absolutely in Hinderk Frerichs, and that the conveyance to the widow by Frerichs was, under the circumstances, not a redemption of the premises, but the acquisition of the absolute fee title in the widow, free from any claim or interest of the appellee therein.

In view of our conclusion, as announced in the next following division of this opinion, and because of the divergent views of the court on this question, we make no pronouncement thereon.

V.    .If the deed from Hinderk Frerichs to the widow, Folka, vested in her the full fee title to the premises in question, then the appellee's rights in said real estate terminated at said time.

2. TENANCY IN COMMON: acquisition of outstanding title by cotenant.

It is contended, however, that, if the acquiring of the title by the widow was, in equity, a redemption of the premises by one cotenant, the appellee is entitled to recover, and that her action is not barred by the statute of limitations. If it be assumed that the acquisition of the title by the widow was an equitable redemption of the premises by one cotenant, it does not of necessity follow that the appellee's right of recovery is not barred by the statute of limitations, or that the same will not be enforced because of the appellee's laches. Between tenants in common, one cotenant cannot start the operation of the statute of limitations until there has been an ouster, or the assertion of a title not consistent with the cotenancy and hostile to the rights of the other cotenant. The widow in this case acquired title to the premises by a special warranty deed. The consideration paid therefor was not inadequate, and was twice the amount that her grantor, Hinderk, had paid two years previous, in acquiring the same from the holder of the sheriff's certificate. She placed the deed of record in 1883, and thereafter took possession of the premises. From that time on, she at all times exercised the rights of ownership. She collected the rents, paid all the taxes, sold off and conveyed one 40-acre tract, mortgaged and remortgaged the premises, and consistently and continuously exercised the rights of an owner in fee simple.

It is true that there is evidence in the record that the widow referred to the farm as having been "redeemed" by her; but, under all the circumstances disclosed in connection with the transaction, we fail to find sufficient in the record to establish conduct inconsistent with her claim of ownership from and after the date that she acquired title by delivery of the deed from Hinderk. It is apparent from the evidence that she did not use the word "redeemed" in a technical or strictly legal

sense, but meant to refer to the fact that she had repurchased or reacquired the premises. The situation is somewhat similar to that disclosed in *Cold v. Beh,* 152 Iowa 368.

The appellee was born July 20, 1876. She was, therefore, past six years of age when the deed from Hinderk to her mother was delivered and placed of record. After the mother acquired title to the farm, she and the appellee lived thereon until the latter was about twelve years old, when the family moved to the village of Holland. The appellee was married when she was eighteen years of age, and continued to reside in Holland, about three miles from the farm in question, until this suit was brought, in 1914.

The appellee, as a witness in her own behalf, testified that she did not know that she had any interest in this property, or that her father had ever owned the land, until in the year 1913. This action was commenced in 1914. The evidence in contravention of this claim by the appellee is so conclusive that we are forced to believe that the appellee is in error in this contention. The record discloses conversations and transactions between the appellee and other parties respecting the farm, long prior to 1913. From this it appears that, some seven years before the commencement of this suit, she had been advised by a friend that she was entitled to two thirds and the mother to one third of the property that belonged to her father. Some significance should be attached to the fact that the husband of the appellee consulted an abstracter with reference to the recovery of his wife's interest in the lands that had been sold under the foreclosure of the mechanics' lien, and that he also had an attorney examine the record of the foreclosure of the mechanics' lien, and received from him a report of the record in said matter, and that this was some eight years before the suit was commenced.

There is also evidence in the record of various conversations with friends and relatives of appellee, regarding the farm and her interest therein. The evidence tends to show that she stated to witnesses that she had been advised by attorneys that she had an interest in the farm, and that her husband had persuaded her not to endeavor to secure it.

The tenant on the farm testified that, during the period

while he was on the farm, the appellee visited the farm repeatedly, and that she told the tenant that she thought she had a share in the farm.

It also appears that, some 15 or 18 years before the trial, the appellee called upon an abstracter, to inquire about her interest in the farm owned by her father, and stated that she thought she ought to have something out of her father's estate.

The appellee denied all these various conversations and transactions.

We have not attempted to set out all of the conversations or incidents referred to in the evidence, but we are satisfied that the appellee, who resided on this farm until she was about twelve years of age, and then continued to live within three miles of it thereafter, who frequently visited the farm during these years, and who conversed with her relatives and friends in regard to it, was fully aware of the fact that the farm had been the property of her father at the time of his decease, and that the mother was claiming ownership thereof and was paying the taxes and otherwise handling the property as her own.

We recently had occasion to review the authorities upon the question of the rights of one cotenant against another, in the case of *Luncy v. Rollins*, 191 Iowa 969. In that cause, we said:

"The law that the entry and possession of one tenant in common is presumed to be for the benefit of all, and that such possession is to be regarded as the possession of all, until rendered adverse by some unequivocal act or series of acts or declaration of the tenant in possession indicating or proclaiming his intention to claim the entire estate, and brought to the actual notice of his cotenants, is too familiar to call for discussion. It is equally well settled that a tenant in possession may oust his cotenant, and start the statute of limitations to running, and acquire title to the whole by adverse possession. Actual notice of the hostile claim of the tenant in possession must, however, be brought to the attention of his cotenant before the statute will run."

We quoted and approved the rule announced in *Burns v. Byrne*, 45 Iowa 285. We also collected some of our previous decisions on the question involved herein.

The rule is well established that, as between tenants in common, actual notice of ouster may be proven by either direct or circumstantial evidence. *Casey v. Casey,* 107 Iowa 192. If it should be conceded that the purchase of the premises by the widow, Folka, from Hinderk Frerichs was, in equity, a redemption by one cotenant of property held in common, we are satisfied from the record in this case that the appellee is not entitled to recover any share in the estate at this time. The widow, after the placing of the deed on record, at all times exercised all of the rights of ownership in the premises in question. We are also satisfied from the record that the appellee knew, for many years after attaining her majority, and long before this action was begun, that the farm in question had been the property of her father, and that the widow had exercised all the rights of ownership thereof, to the complete exclusion and denial of any rights on the part of the appellee.

It follows that appellee's action was barred by the statute of limitations.

VI. It is true that mere occupancy of the premises, even for a longer period than ten years, is not of itself sufficient to establish a title against a cotenant by adverse possession. But we have much more than this in the instant case. The appellee has not been a stranger to this situation. Waiving all question of her knowledge of the public records of the county, or of the published maps· and tax lists, we think it fairly appears from the evidence that the appellee knew for many years that her father had owned the farm, and that her mother was claiming it absolutely as her own. Both she and her husband had made inquiries regarding the title. She had stated to relatives and friends that she thought she had or should have an interest in the premises. She lived near the place and visited it occasionally, and talked with the tenant about her having an interest in it. The greater weight of the testimony convinces us that she must have known and did know that her father had owned the farm, and that her mother was claiming and exercising full ownership thereof.

The appellee's knowledge of the original ownership must be presumed; for it was not only a matter of record, but of notoriety. *Laraway v. Larue,* 63 Iowa 407; *Knowles v. Brown,*

69 Iowa 11; *Hanson v. Gallagher*, 154 Iowa 192. For about 20 years since attaining her majority, she has stood by, under these circumstances, while the widow was openly exercising all the rights of an owner in fee simple, under a claim of right.

We think the record discloses all the essential elements to establish a title in the widow by adverse possession. The record title to real estate, followed by long-continued occupancy, accompanied by the usual acts of ownership, such as the erection of buildings, the execution of mortgages on the premises, the sale and conveyance of a portion thereof, the payment of taxes, and the collection of rents, cannot be disturbed, except upon satisfactory and convincing proof. This is especially true where the party seeking to impeach such title has been in a position to know and has known the situation for a long period of years, and has stood by without any attempt to impeach such title.

In this case, we find that the appellee has failed to establish her right to claim an interest in the real estate in controversy, as an heir of her deceased father.

It follows that the decree of the trial court must be, and the same is,—*Reversed.*

Evans, C. J., Stevens and Arthur, JJ., concur.